**WARNER COMMUNICATIONS, INC., Plaintiff,**

v.

**Keith Rupert MURDOCH, et al., Defendants.**

**NEWS INTERNATIONAL PLC, Counterclaim and Third-Party Plaintiff,**

v.

**WARNER COMMUNICATIONS, INC., Counterclaim-Defendant,**

**Steven J. Ross, et al., Third-Party Defendants.**

**Civ. A. No. 84–13 CMW.**

United States District Court, D. Delaware.

March 16, 1984.

Rodman Ward, Jr., and Thomas J. Allingham, II, Wilmington, Del. of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff-counterclaim defendant, Warner Communications, Inc.; Robert E. Zimet, Douglas M. Kraus, and Jeremy A. Berman, New York City, of counsel.

Martin P. Tully, and Thomas R. Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant-counterclaim and third-party plaintiff, News Intern. plc.; Arnold Bauman, W. Foster Wollen, and Jeremy G. Epstein of Shearman & Sterling, Howard M. Squadron, and Neal M. Goldman of Squadron, Ellenoff, Plesent & Lehrer, New York City, Frederick P. Furth, and Daniel S. Mason of Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., of counsel.

Charles S. Crompton, Jr., James F. Burnett, and Donald J. Wolfe, Jr. of Potter, Anderson & Corroon, Wilmington, Del., for third-party defendants, Chris-Craft Industries, Inc. and BHC, Inc.

R. Franklin Balotti, and Jesse A. Finkelstein, of Richards, Layton & Finger, Wilmington, Del., for defendant, Stanley S. Shuman; James C. McMillin, and Jerome H. Powell of Werbel, Grossman & McMillin, New York City, of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The conduct of corporate affairs often produces highly charged, hostile battles for corporate control; battles which often resemble a corporate form of feudal warfare. Invariably, these battles are taken out of the marketplace and brought into court, whereby courts are asked to serve as arbiters between the warring factions. This case arises out of such an instance.

## BACKGROUND

Commencing in August, 1983, The News Corporation, Ltd. ("News Corporation") and its wholly-owned subsidiary, News International plc ("News International"), began making substantial open market purchases of common stock in Warner Communications, Inc. ("Warner"). News Corporation and News International are companies which are principally controlled and managed by Keith Rupert Murdoch. Forty-six percent of the common stock of News Corporation is owned by Cruden Investments Pty. Limited ("Cruden"), whose stock is wholly owned by various trusts for the benefit of Murdoch and members of his family. Murdoch is Managing Director and Chief Executive Officer of News Corporation, and is Chairman of the Board and Managing Director of News International.

On December 1, 1983, News Corporation and News International jointly filed a Schedule 13D Statement with the SEC pursuant to § 13(d) of the Securities Exchange Act of 1934,[1] disclosing their acquisition of 6.7% of Warner's outstanding common stock. On December 13, 1983, News Corporation and News International filed an Amendment to their 13D Statement, disclosing additional purchases of Warner stock that increased their ownership to 7% of Warner's outstanding common stock.

Shortly after News Corporation and News International announced their foothold position in Warner, Warner commenced negotiations with Chris-Craft Industries, Inc. ("Chris-Craft") regarding an exchange of stock between the two companies. On December 29, 1983, the two companies announced, in a press release, that they had reached a binding agreement (the "Exchange Agreement") on an exchange of stock.

---

**1.** 15 U.S.C. § 78m(d) (1976).

The Exchange Agreement provided that Warner would issue to BHC, Inc. ("BHC"), a subsidiary of Chris-Craft, 15,200,000 shares of non-convertible cumulative preferred stock. The stock would carry voting rights, representing approximately 19% of the total voting power of all outstanding Warner stock, as well as antidilution provisions protecting against the diminution of this voting power. In addition, the stock would carry a "put" provision under which BHC could resell the stock to Warner if any shareholder unaffiliated with Chris-Craft acquired 33.3% or more of Warner's outstanding common stock. The repurchase price would be equal to the highest price paid by the 33.3% shareholder for any shares purchased within the preceding six month period.

The Exchange Agreement, however, provided Warner with the option of exchanging the non-convertible cumulative preferred stock for an equal number of convertible cumulative preferred shares. The 15,200,000 preferred shares would be convertible into 12,001,920 common shares, amounting to approximately 15% of Warner's outstanding common stock. The convertible preferred stock, like the non-convertible preferred stock, would carry voting rights and antidilution provisions protecting against the diminution of the stock's voting power. However, in contrast to the non-convertible preferred stock, the convertible preferred shares would not possess a put provision triggered by another shareholder's accumulation of Warner stock.

Under the Exchange Agreement, BHC would issue to Warner 143,750 shares of convertible cumulative preferred stock. The preferred stock would carry voting rights, representing approximately 20% of the total voting power of all outstanding BHC stock. The preferred shares would be convertible into 425,000 shares of BHC common stock after September 15, 1984. The 425,000 shares would represent approximately 42.5% of the total voting power of all outstanding BHC stock.

In response to Warner's and Chris-Craft's December 29, 1983 announcement of their Exchange Agreement, News Corporation and News International, on December 30, 1983, filed a Notification and Report under the Hart-Scott-Rodino Antitrust Improvement Act of 1976,[2] seeking regulatory clearance to purchase up to 49.9% of Warner's outstanding voting securities. On January 5, 1984, News Corporation and News International filed a second Amendment to their 13D Statement, disclosing their possible intention to acquire up to 49.9% of Warner's outstanding voting securities. Since the expiration, on January 18, 1984, of the waiting period applicable to News Corporation and News International under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the companies have resumed their purchases of Warner stock on the open market, increasing their holdings to over 8.5% of Warner's outstanding common stock.

On January 6, 1984, News International filed suit in the Delaware Court of Chancery against Warner, Chris-Craft, BHC and inside directors of the companies, claiming, *inter alia*, that the terms of the Exchange Agreement are unfair to Warner and its shareholders, and that the Agreement was entered into for the primary purpose of entrenching Warner's management. On January 12, 1984, Chancellor Brown denied News International's motion for a temporary restraining order enjoining the consummation of the exchange of stock between Warner and Chris-Craft. *News International plc v. Warner Communications, et al.*, C.A. No. 7420 (Del.Ch., January 12, 1984). Chancellor Brown based his ruling, in part, upon Warner's assurances that Warner's non-convertible preferred stock, with its put provision, would be used only as a bridge security in the transaction and that Warner would exercise its option to exchange the non-convertible preferred shares for the convertible preferred shares, upon securing the New York Stock Exchange's approval of the listing of the com-

---

**2.** Pub.L. No. 94–435, 90 Stat. 1383 (codified in scattered sections of Titles 15, 18 and 28 U.S.C.).

mon stock underlying the convertible preferred stock. *Id.*, at 2–3.

On January 18, 1984, Warner and Chris-Craft consummated their exchange of stock (the "W–CC Transaction"). Warner initially issued its non-convertible preferred stock to BHC in exchange for BHC's convertible preferred stock. However, on January 19, 1984, the New York Stock Exchange approved the listing of the common stock underlying Warner's convertible preferred stock. Thus, on January 19, 1984, Warner exercised its option to exchange the non-convertible preferred shares issued to BHC for the convertible preferred stock.

On January 29, 1984, Chris-Craft, BHC, and United Television, Inc. ("UTV"), a subsidiary of BHC, jointly filed a 13D Statement with the SEC, disclosing their holdings of Warner stock and their possible intention of acquiring additional shares in the future. As a result of the W–CC Transaction and open market purchases of Warner common stock, the Chris-Craft group presently owns in excess of 20% of Warner's outstanding voting securities.

THE LAWSUIT

On January 10, 1984, Warner filed the present suit against Murdoch; News Corporation; News International; Cruden; and Stanley Shuman, a director of News Corporation and an investment advisor to Murdoch (the "Murdoch Group"). Warner claims that the 13D Statements of News Corporation and News International are false and misleading in various respects, and that the Murdoch Group's acquisition of Warner stock threatens to create regulatory and contractual problems for Warner, resulting in tortious interference with Warner's conduct of business.

News International,[3] in turn, has filed counterclaims and third-party claims against Warner; Warner's directors; Chris-Craft; BHC; and Chris-Craft's directors. News International claims that the W–CC Transaction is the end-product of a long-planned, clandestine entrenchment scheme by Warner's management. News International alleges that, by concealing the entrenchment plan and by engaging in the W–CC Transaction, Warner and its directors have violated § 10(b) of the Securities Exchange Act of 1934[4] and Rule 10b–5[5] promulgated thereunder, and § 17(a) of the Securities Act of 1933.[6] In addition, News International claims that, by participating in, and aiding and abetting these violations, Chris-Craft, BHC, and Chris-Craft's directors have violated § 10(b) and § 20[7] of the Exchange Act, and § 17(a) of the Securities Act. Furthermore, News International claims that the aforementioned alleged misconduct by Warner and its directors, together with other alleged misdeeds, constitute a "pattern of racketeering activity" in violation of § 1961, *et seq.* of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[8]

News International also alleges that Chris-Craft and BHC have filed a late and false and misleading 13D Statement in violation of § 13(d) of the Security Exchange Act of 1934.[9] In addition, News International claims that Warner; Warner's directors; Chris-Craft; BHC; and Chris-Craft's directors have formed a § 13(d) "group" for the purpose of acquiring Warner stock and pooling their shares to form a control block; yet the parties have not filed a 13D Statement disclosing the existence of the group, in violation of § 13(d) of the Exchange Act.

On the basis of these alleged violations, News International seeks injunctive relief, including rescission of the W–CC Transaction, and treble damages under § 1964(c) of RICO. Warner and Chris-Craft and BHC

---

**3.** Defendants Murdoch, News Corporation, Cruden, and Shuman have filed Motions to Dismiss Warner's claims on, *inter alia*, jurisdictional grounds. They have, therefore, not joined in News International's counterclaims and third-party claims.

**4.** 15 U.S.C. § 78j(b) (1976).

**5.** 17 C.F.R. § 240.10b–5.

**6.** 15 U.S.C. § 77q(a) (1976).

**7.** 15 U.S.C. § 78t (1976).

**8.** 18 U.S.C. § 1961, *et seq.* (1976).

**9.** 15 U.S.C. § 78m(d) (1976).

have filed Motions to Dismiss News International's claims on grounds of failure to state a claim upon which relief may be granted. For the reasons set forth herein, the Court dismisses with prejudice all of the claims against Warner, and all of the claims, except the § 13(d) claims, against Chris-Craft and BHC. Furthermore, although Warner's directors and Chris-Craft's directors have not joined in the motions to dismiss,[10] the grounds for the Court's dismissal of the § 10(b), § 17(a), and RICO claims against Warner, and the § 10(b), § 20, and § 17(a) claims against Chris-Craft and BHC, apply equally to the respective claims against Warner's and Chris-Craft's directors. Therefore, with the exception of the § 13(d) claims, all of News International's claims against Warner's and Chris-Craft's directors are dismissed with prejudice.

## SECTION 10(b) CLAIMS AGAINST WARNER AND ITS DIRECTORS

▮▮▮ News International's pleadings are filled with allegations of the unfairness of the W–CC Transaction to Warner and its shareholders, and the ulterior purpose of the transaction to entrench Warner's management. These allegations, however, simply amount to claims of breach of fiduciary duty by Warner's management. It is clear that such allegations, standing alone, fail to state a claim under Rule 10b–5. *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Rule 10b–5 provides a remedy for fraud committed in connection with the purchase or sale of securities. Essential to a claim of fraud is the element of deception or misrepresen-

tation. *Id.* at 471–76, 97 S.Ct. at 1299–1302.

News International's claims, however, go further than these simple allegations of breach of fiduciary duty. As more fully developed in News International's briefs and at oral argument on the present motions to dismiss, News International alleges that the W–CC Transaction is the end-product of a long-planned entrenchment scheme by Warner's management which has been fraudulently concealed from Warner's shareholders and the market in general for a number of years. News International appears to contend that, as a result of this concealment, the Murdoch Group has been fraudulently misled into purchasing a substantial block of Warner's stock with the possible intention of later acquiring control of Warner,[11] only to have Warner's management undertake the W–CC Transaction to block a possible takeover bid. News International further contends that Warner's management has continued to conceal this entrenchment scheme, as reflected by alleged omissions in the December 29, 1983 press release announcing the W–CC Transaction. Although these allegations facially appear to state a claim under 10b–5, they fail to withstand scrutiny upon closer examination.

### 1. *Concealed 2-Step Entrenchment Plan*

News International contends that management's entrenchment plan was first manifested in certain amendments to Warner's Charter and By-Laws, which were submitted to, and approved by, Warner's shareholders in 1975. The purpose and

---

**10.** Chris-Craft's directors have filed a Motion to Dismiss News International's claims on grounds of failure to state a claim upon which relief may be granted, and on jurisdictional grounds. The parties, however, have delayed briefing the Motion apparently until after the Court rules upon the parallel issues involved in Chris-Craft's and BHC's Motion to Dismiss. Similarly, counsel for News International has agreed to extend the time for Warner's directors to respond to News International's claims until after the Court rules upon the present Motions to Dismiss.

**11.** The Court does not hereby construe News International's contentions in such a way to

constitute an admission of the merits of Warner's claim that News International's and News Corporation's initial 13D Statement was false and misleading for failing to disclose an intention to acquire control of Warner. Rather, for purposes of the present motions to dismiss, the Court is simply construing News International's allegations in a light most favorable to its claims. That the Murdoch Group purchased stock in Warner with the possible intention of later acquiring control of the corporation does not necessarily imply that this intention to acquire control was sufficiently "ripe" at the time of the purchases to require disclosure under § 13(d) of the Exchange Act.

effect of the amendments are to make it difficult for Warner's management to be removed from office, and difficult for another company to acquire Warner by means of a hostile takeover.

In particular, Warner's Charter provides that certain major corporate transactions, such as a merger or sale of substantially all corporate assets, between Warner and a beneficial owner of 10% of Warner's voting stock, must be approved by 80% of Warner's voting shareholders, as well as a majority of shareholders other than the 10% stockholder. Warner's directors, however, are vested with the discretion to waive this requirement and apply less restrictive shareholder approval requirements otherwise applicable under the Charter.

Warner's Charter also provides that Warner's directors may be removed from office (other than by election) only for cause and by the vote of 80% of Warner's shareholders and a majority of shareholders other than a 10% stockholder. In addition, Warner's By-Laws provide for a three class, staggered board of directors, and vest the directors with the discretion to enlarge the present 14 member board to as many as 31 directors and fill the newly created vacancies. Finally, the Charter provides that each of the aforementioned Charter and By-Law provisions may be amended only by a vote of 80% of Warner's shareholders and a majority of shareholders other than a 10% stockholder.

News International alleges that these Charter and By-Law amendments were the first step of a 2-step entrenchment plan by Warner's management. The alleged second step of the plan consists of the is-suance of approximately 20% of Warner's stock to a "friendly" party in the event of a hostile takeover attempt of Warner. In conjunction with the supermajority charter provisions, the issuance of 20% of Warner's stock to a friendly party creates a "veto block" that substantially impedes a hostile takeover. News International contends that the W–CC Transaction constitutes the second step of this entrenchment plan, and that Warner's management has, for many years, fraudulently concealed this long-planned entrenchment scheme, to the detriment of News International and other Warner shareholders.

News International, however, has set forth few specific facts to support these general allegations. The only facts that are alleged to support the claim of a long-planned, 2-step management entrenchment scheme are the 1975 adoption of the Charter and By-Law provisions and the recent W–CC Transaction. Even assuming that each of these sets of actions were illegitimately undertaken by management for the primary purpose of entrenchment, News International has set forth no specific facts to support the claim that these two sets of actions, occurring eight years apart, were part of a common, pre-developed plan of entrenchment. Furthermore, apart from the December 29th press release, discussed below, News International has identified no specific instances of affirmative concealment of the alleged entrenchment plan that would support a claim under 10b–5.[12] That is, News International has identified no specific public statements by Warner or its management that are false and misleading for failing to disclose the alleged entrenchment scheme.[13]

---

**12.** Although some courts have implied that 10b–5 imposes an affirmative duty on corporations and management to disclose any material information about their activities to the marketplace, *see Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973), this theory has not won wide acceptance by the courts. The Third Circuit, in *Staffin v. Greenberg,* 672 F.2d 1196, 1204 (3d Cir.1982), expressly rejected such a rule, holding instead that 10b–5 imposes no duties of disclosure upon corporations and management apart from the duty to abstain from engaging in securities transactions on the basis of material non-public information, and the duty to make accurate and complete disclosures if and when public statements are made.

**13.** News International does appear to implicitly suggest that the 1975 proxy statement concerning the Charter and By-Law amendments is misleading for failing to disclose the alleged entrenchment scheme. Nevertheless, it is subject to serious question whether a misrepresentation in a 1975 proxy statement has a continuing materiality to unrelated securities transactions in 1983. *See* 5A A. Jacobs, *Litigation and Practice Under Rule 10b–5,* § 61.01[b], at 3–40 (2d

■ To state a claim for fraud, under the securities laws or otherwise, a party must plead the elements of the fraud with a high degree of particularity. F.R.C.P. 9(b); *see Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982). In any lawsuit, a party may not simply plead conclusory allegations in hopes of ascertaining facts, through discovery, to support the claims. This is particularly true with respect to fraud claims, which simply by their pendency, have an "in terrorem" effect that can produce significant injury to a defendant. News International's pleadings, even as supplemented by its briefs, fail to satisfy this requirement of particularity. However, even assuming the truth of News International's very general allegations, the Court finds no violation of the federal securities laws in the failure of Warner's management to publicly disclose an entrenchment plan.

■ It is well established that corporate officers and directors do not violate the federal securities laws by failing to disclose an entrenchment motive or entrenchment scheme underlying their actions. *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1291 (N.D.Ill.1981); *Bucher v. Shumway,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 at 96,299–300 (S.D.N.Y.1979), *aff'd. mem.,* 622 F.2d 572, *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *Tyco Laboratories v. Kimbell,* 444 F.Supp. 292, 298 (E.D. Pa.1977); *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221, 248 (S.D.N.Y.1975). This is simply one component of the general rule that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions. *See, e.g., Atchley v. Qonaar Corp.,* 704 F.2d 355, 358 (7th Cir.1983); *Panter v. Marshall*

*Field & Co.,* 646 F.2d at 288; *Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir. 1978).

The policy considerations underlying this rule are principally threefold. First, in the absence of such a rule, parties would be placed in the untenable position of either publicly confessing their potential misconduct before their guilt is properly determined by a court, or incurring liability for damages resulting from their failure to disclose the misconduct. Second, absent such a rule, instances of misconduct which do not constitute securities fraud but which constitute violations of state law, would, nevertheless, often give rise to a 10b–5 claim for failure to disclose the misconduct. As a result, the state law claim would effectively be boot-strapped into a 10b–5 claim and brought into the federal courts for resolution, circumventing the federalism considerations underlying *Santa Fe Industries, Inc. v. Green,* 430 U.S. at 478–79, 97 S.Ct. at 1303–04. Third, the rule does not significantly impede the flow of material information to investors. The rule limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct.

This third point is pertinent to this case. For although Warner's management would not be obligated under 10b–5 to disclose an entrenchment scheme *per se,* it is arguable that management would be obligated to disclose material facts relating to such a scheme, such as management's planned strategies for responding to a hostile takeover attempt. Notwithstanding the potential materiality of such information, the Court finds that such information need not be disclosed.

■ Corporations frequently undertake "defensive reviews" to consider their op-

ed. 1983); *see also Ross v. A.H. Robins Co., Inc.,* 465 F.Supp. 904, 908 (S.D.N.Y.), *rev'd. on other grounds,* 607 F.2d 545 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) ("logic compels the conclusion that time may render statements immaterial"). In the absence of a limit on the continuing materiality

of public statements by corporations or management, any misrepresentations in a statement could potentially result in liability to all investors who, at anytime thereafter, engage in transactions in the company's stock. At some point, such a result would be not only harsh, but simply absurd.

tions in the event of a hostile takeover attempt. Often, pre-planned strategies are developed for responding to an undesired suiter. *See generally* A. Fleischer, *Tender Offers: Defenses, Responses, and Planning* (1981). Such pre-planned strategies are not necessarily illegitimate. In fact, they may serve a positive function. Defensive tactics themselves are illegitimate only if a target's management fails to exercise its business judgment and engages in such tactics for the primary purpose of entrenchment. *See, e.g., Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 380–83 (2d Cir.1980); *Johnson v. Trueblood,* 629 F.2d 287, 292–93 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Pre-planning for the contingency of a hostile takeover bid might reduce the risk that, under the pressure of a takeover bid, management will fail to exercise its business judgment and undertake hastily planned defensive actions that substantially harm shareholder interests. Even illegitimate defensive tactics might be rendered less harmful to shareholders as a result of pre-planning.

Pre-planned defensive strategies, however, are inherently contingent in nature. They are triggered only if a hostile takeover attempt occurs and the target's management decides to oppose the takeover. Moreover, even a firmly established defensive strategy, to be effective, must be flexibly adapted to respond to the particular facts of a specific takeover bid.

■ It is well established that the federal securities laws do not impose a duty to disclose information regarding current or future plans that are uncertain and contingent in nature. *See, e.g., Reiss v. Pan American World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983); *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 398 (8th Cir.1976); *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir.1970). This principle is grounded in the concern that it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans. Requiring disclosure would place a party in the harsh position of facing liability if the plans are

not disclosed but they come to fruition, as well as liability if the plans are disclosed but they fail to be consummated.

On the basis of these considerations, courts have tended to apply a strong presumption against imposing liability under the federal securities laws for failing to publicly disclose plans that are contingent in nature. The issue of disclosure often arises in cases where a company is actively seeking to undertake a merger or other major transaction, or is actually in the process of negotiating such a transaction. Courts have generally held that even at these stages in the planning of a transaction, the federal securities laws do not require disclosure of even the possibility of the transaction's occurrence. *See, e.g., Reiss v. Pan American World Airways, Inc.,* 711 F.2d at 13–14; *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d at 397–98.

■ This presumption against disclosure has been applied in cases where, during the heat of a takeover battle, a target company is actively negotiating a defensive merger. *See, e.g., Staffin v. Greenberg,* 672 F.2d 1196, 1205–07 (3d Cir.1982); *Crane Co. v. Anaconda Co.,* 411 F.Supp. 1208, 1210 (S.D.N.Y.1975). In light of this strong presumption against required disclosure of contemplated transactions even at this stage of negotiation, the Court finds that any strategy by Warner's management to issue a block of stock to a friendly party in the event of a hostile takeover bid did not require disclosure at the mere planning stage, regardless of the strength of management's commitment to ultimately follow through with the defensive tactic. Thus, News International fails to state a claim with respect to management's alleged concealment of an entrenchment scheme prior to the consummation of the Exchange Agreement regarding the W–CC Transaction.

This conclusion is reinforced by the delicate balance to be struck between the federal securities laws' disclosure goals and the securities laws' effect of regulating corporate management. There is a point

beyond which the application of the securities laws excessively interferes with conduct of corporate affairs, *see Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 518 (10th Cir.), *cert. denied*, 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973), or the regulation of corporate mismanagement under state law. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. at 478–79, 97 S.Ct. at 1303–04; *Ketchum v. Green*, 557 F.2d 1022, 1027–28 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). Although not determinative of the Court's holding, the Court believes that imposing a duty upon management to disclose strategies for responding to undesired takeover bids would extend the scope of the securities laws beyond this point of balance.

As noted above, management's pre-planning for the possibility of a hostile takeover bid may serve a positive function. It removes management's decision-making from the pressures of an immediate takeover battle, thereby tending to reduce the possibility of irrational responses to a takeover bid. Requiring public disclosure by defensive strategies, however, may have a chilling effect upon such pre-planning. Not only does the contingent nature of such strategies place management in the untenable position of potentially incurring liability both if the strategies are disclosed and if they are not, but the potentially questionable nature of management's actions might also give rise to vexatious shareholder suits if the plans are disclosed. The net result may be to deter management from engaging in pre-planning for the contingency of a hostile takeover bid.

In the event of a takeover battle, it often would not be difficult for a bidder to facially state a claim that management has failed to disclose previously developed defensive strategies or that management's prior disclosures regarding such strategies are false and misleading in some respect. Regardless of the legitimacy of management's defensive tactics under state law, a bidder might be able to enjoin management's actions on the basis of its disclosure claims or at least receive a substantial sum in damages on the basis of such claims.

The result would be to effectively preempt a substantial body of state corporate law, contrary to the principles underlying *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 478–79, 97 S.Ct. at 1303–04, and provide bidders with a substantial weapon that underwrites the risks of takeover attempts, contrary to the intended neutrality of the federal securities laws with respect to the positions of bidders and targets. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 27–31, 97 S.Ct. 926, 942–944, 51 L.Ed.2d 124 (1977), *reh'g. denied*, 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d 371 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58–59, 95 S.Ct. 2069, 2075–2076, 45 L.Ed.2d 12 (1975).

These considerations must be counterbalanced against the benefits of requiring disclosure of defensive strategies. Although there can be little dispute that such information is of some importance to investors, the degree of its materiality is subject to question. It is no secret that companies almost invariably engage in defensive tactics when faced with an undesired takeover bid. Under the federal securities laws, investors are charged with knowledge of information of which they reasonably should be aware. *See, e.g., Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978); *Rodman v. Grant Foundation*, 460 F.Supp. 1028, 1035–36 (S.D.N.Y.1978), *aff'd.*, 608 F.2d 64 (2d Cir.1979). In this respect, courts have often held that investors are charged with knowledge of the "universal" interest of corporate officers and directors in maintaining corporate control. *See, e.g., Brayton v. Ostrau*, 561 F.Supp. 156, 165 (S.D.N.Y.1983); *Tyco Laboratories v. Kimbell*, 444 F.Supp. at 298; *Falkenberg v. Baldwin*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,086, at 91,911 (S.D.N.Y.1977).

Of course, the general knowledge that target companies engage in defensive tactics does not equate with knowledge of the specific intentions of a particular company. Nevertheless, given the inherently contingent nature of defensive strategies, it is very doubtful whether the federal securi-

ties laws could reasonably impose any greater duty upon management than to inform investors of the possibility of management's engaging in defensive tactics. Although in many instances a general statement to this effect might be materially incomplete, it is questionable whether even legally sufficient disclosures would provide significantly greater information to investors. More likely than not, a disclosure requirement would often simply provide a basis for costly and vexatious litigation.

These points are illustrated by the facts in this case. The 1975 Charter and By-Law amendments, by their very nature, would seem to put investors on notice that Warner's management might be unreceptive to an unsolicited takeover bid. Moreover, if management were to engage in defensive tactics in response to a takeover attempt, a logical tactic would be to issue stock to a friendly party to create a veto block in conjunction with the supermajority charter provisions. To the extent that these facts are not implied by the very existence of the Charter and By-Law provisions, they are more explicitly revealed by the 1975 proxy statement proposing the Charter and By-Law amendments. The proxy statement provides in relevant part:

> The proposed amendments are prompted by the frequent attempts in recent years by one corporation or group to acquire control of another corporation through the acquisition of a substantial number of shares of the other corporation's stock followed by a forced merger or other similar transaction. Such a transaction might not be in the best interests of the Company or its stockholders. The proposed amendments will make it more difficult to effect such a transaction and might therefore discourage any attempt to do so. For these reasons, the board of directors believes the amendments should be adopted.... In considering these proposed amendments stockholders should recognize that one result is that the board of directors will be able to determine the vote by which the aforementioned mergers, acquisitions or other similar transactions

with a substantial stockholder must be approved by the stockholders, and such determination may in turn result in the retention by management of control over the affairs of the Company. Furthermore, under circumstances in which the amendments would apply, a minority in interest of the stockholders may prevent a transaction favored by a majority of the stockholders. For example, if another corporation acquires 10% of the Company's outstanding voting stock and proposes (and votes for) a merger of the Company into that corporation, the merger proposal may be blocked by the holders of more than 20% of the total outstanding voting stock of the Company. And if another corporation acquires 80% of the Company's outstanding voting stock and proposes (and votes for) a merger of the Company into that corporation, the merger proposal may be blocked by the holders of 10% of the total outstanding voting stock of the Company, as such transaction requires the approval (described above) of the holders of a majority of the outstanding shares not owned or controlled, directly or indirectly, by the other corporation.

Warner Communications, Inc. Proxy Statement 18–19 (March 31, 1975).

Thus, it is questionable whether a reasonable investor, charged with knowledge of information of which he reasonably should be aware, would be without notice of the possibility that Warner's management might issue stock to create a veto block in response to a potential takeover bid. Certainly, it is questionable whether a reasonable investor in the position of the Murdoch Group, with its substantial experience in the field of corporate acquisitions, would be without knowledge of this possibility.

The Court, however, does not, and need not, reach this issue. As a matter of law, Warner's management had no duty to disclose any defensive strategies at the mere planning stage, given the inherently contingent nature of such plans. Nevertheless, the policy considerations discussed above

reinforce this holding. They are considerations to which a court must not be blind.

### 2. *False and Misleading Press Release*

News International contends that Warner's management has continued to conceal its entrenchment scheme. Specifically, News International alleges that the December 29th press release announcing the W–CC Transaction contains numerous material omissions designed to conceal the true purpose of the transaction.

 Among the alleged omissions are the failure to disclose that the transaction is designed to entrenchment management; that the transaction lacks a valid business purpose; and that the transaction is unfair to Warner and its shareholders. However, as discussed above, Warner's management is not obligated under the federal securities laws to publicly disclose an entrenchment motive to the transaction. *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d at 288; *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. at 1291; *Bucher v. Shumway*, [1979–1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) at 96,299–300; *Tyco Laboratories v. Kimbell*, 444 F.Supp. at 298; *Jewelcor, Inc. v. Pearlman*, 397 F.Supp. at 248. For similar reasons, management is not required to disclose, *inter alia*, that the transaction lacks a valid business purpose or is unfair to Warner and its shareholders. *See, e.g., Beisenbach v. Guenther*, 588 F.2d at 402; *Dofflemyer v. W.F. Hall Printing Co.*, 558 F.Supp. 372, 384 (D.Del.1983); *Merritt v. Colonial Foods, Inc.*, 499 F.Supp. 910, 914 (D.Del.1980).

 News International does allege other omissions regarding the terms and effects of the W–CC Transaction which might render the press release materially false and misleading under 10b–5. Nevertheless, News International has failed to allege any specific injury resulting from these omissions. Furthermore, the undisputed facts in the case, even when construed in a light most favorable to News International, fail to indicate any such injury.

Rather than being deceived by the press release, the Murdoch Group filed suit in the Delaware Court of Chancery to block the W–CC Transaction within days after the announcement of the transaction in the press release. Thus, News International cannot claim injury under *Goldberg v. Meridor*, 567 F.2d 209, 217–21 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), and its progeny, *see Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 646 (3d Cir.1980), on grounds of being deceived into failing to exercise its state law rights to seek injunctive relief against the transaction. Nor can News International claim injury on grounds of being deceived by the press release in its purchases of Warner stock. News International's and News Corporation's 13D Statements indicate that from early December, 1983 until January 18, 1984, the Murdoch Group did not make any purchases of Warner stock. By January 18th, the Murdoch Group had already ascertained the full terms of the W–CC Transaction through discovery in the Court of Chancery action. In fact, within days after the Murdoch Group resumed its purchases of Warner stock, News International filed its counterclaims and third-party claims in this suit, detailing the alleged omissions in the press release.

Rather than seeking relief for injuries resulting from the alleged omissions in the press release, News International apparently seeks relief for injuries resulting from management's alleged misconduct in entering into the W–CC Transaction, on the theory that the W–CC Transaction is but part of an overarching "fraudulent" entrenchment scheme, manifested by the fraudulent misrepresentations in the press release. However, the principles of *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 471–79, 97 S.Ct. at 1299–1304, may not be circumvented by such bootstrapping.

To begin with, it is very doubtful whether News International satisfies the "purchaser/seller" requirement of 10b–5 with respect to any "fraud" committed in connection with the W–CC Transaction. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ketchum v. Green*, 557

F.2d at 1027–29; *Shamrock Associates v. Maraga Corp.,* 557 F.Supp. 198, 203–05, 208–09 (D.Del.1983). News International contends that, notwithstanding any failure to satisfy the purchaser/seller requirement of 10b–5, it nevertheless has standing to seek injunctive relief to rescind the W–CC Transaction. In support of this claim, News International relies upon a line of cases in which courts have held that the purchaser/seller requirement is inapplicable where injunctive relief is sought to enjoin continuing or future violations of 10b–5. *See, e.g., Kahan v. Rosenstiel,* 424 F.2d 161, 172–73 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Mutual Shares Corp. v. Genesco, Inc.,* 384 F.2d 540, 546–47 (2d Cir.1967). News International's claim for injunctive relief arguably falls within this exception to the purchaser/seller requirement on the theory that, absent such relief, News International will suffer continuing and future injury as a result of the W–CC Transaction.

■ These early cases upon which this exception to the purchaser/seller requirement stands, however, were decided prior to the Supreme Court's holding in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In light of the holding in *Blue Chip,* the Third Circuit has construed this exception to be a narrow one. The exception applies to cases where a 10b–5 violation might occur in connection with a prospective purchase or sale of securities. It allows parties to obtain preventive injunctive relief enjoining the 10b–5 violation prior to the purchase or sale of the securities. *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194–95 (3d Cir.1976). News International's claim for injunctive relief falls outside this narrow exception. For the W–CC Transaction has already been consummated and any resulting securities violations have already occurred. *Id.,* at 194–95.

■ More fundamentally, the fact that Warner's management might have committed a 10b–5 violation by issuing a misleading press release to conceal misconduct in connection with the W–CC Transaction does not convert the latter misdeed into a 10b–5 violation, notwithstanding the fact that the misconduct and the concealment of it might have arisen out of a common plan of entrenchment. The alleged entrenchment plan is, in itself, neither fraudulent nor a breach of management's fiduciary duties. "The unclean heart of a director is not actionable ... unless the impurities are translated into actionable deeds or omissions both objective and external." *Stedman v. Storer,* 308 F.Supp. 881, 887 (S.D. N.Y.1969). Moreover, management's alleged misconduct in entering into the W–CC Transaction simply amounts to state law violations of management's fiduciary duties. News International has filed suit in the Court of Chancery on the basis of these alleged violations.

■ To state a claim under the federal securities laws, there must be a causal link between a party's injuries and the securities law violations. *See, e.g., Ketchum v. Green,* 557 F.2d at 1028–29; *Tully v. Mott Supermarkets, Inc.,* 540 F.2d at 194. Here, News International's injuries have resulted from the alleged state law violations in connection with the W–CC Transaction, not the alleged securities law violations in connection with the press release. This Court, and many others, have consistently rejected claims under the securities laws where a party's injuries have resulted not from alleged misrepresentations relating to acts of misconduct, but rather, from the alleged misconduct itself. *See, e.g., Schreiber v. Burlington Northern, Inc.,* 568 F.Supp. 197, 204 (D.Del.1983); *Halle & Stieglitz, Filor, Bullard, Inc. v. Empress International, Ltd.,* 442 F.Supp. 217, 223–25 (D.Del.1977); *Panter v. Marshall Field & Co.,* 646 F.2d at 283–84, 291; *Gaines v. Haughton,* 645 F.2d 761, 774–76 (9th Cir. 1981); *Altman v. Knight,* 431 F.Supp. 309, 314 (S.D.N.Y.1977).

For the foregoing reasons, News International's § 10(b) counterclaims against Warner and third-party claims against Warner's directors are dismissed with prejudice.

SECTION 17(a) CLAIMS AGAINST WARNER AND ITS DIRECTORS

■ News International claims that, by undertaking the W–CC Transaction and concealing an alleged entrenchment plan, Warner's directors, together with Warner, have violated § 17(a) of the Securities Act, an antifraud provision similar to § 10(b) of the Exchange Act. This Court, however, has held previously that an implied private right of action does not exist under § 17(a) of the Securities Act. *See Hill v. Der*, 521 F.Supp. 1370, 1373–78 (D.Del.1981); *see also Hill v. Equitable Trust Co.*, 562 F.Supp. 1324, 1345 (D.Del.1983).[14]

News International seeks to distinguish the holdings in these cases on the grounds that the cases involved claims for damages, whereas here, News International seeks injunctive relief. This distinction, however, is a dubious one. The statutory analysis applied by Judge Latchum in *Hill v. Der*, 521 F.Supp. at 1373–78, and followed by this Court in *Hill v. Equitable Trust Co.*, 562 F.Supp. at 1345, applies with equal force to News International's claim for injunctive relief.

In very limited circumstances, this Court and others have granted standing to sue for injunctive relief under various provisions of the securities acts, despite a party's lack of standing to sue for damages. These cases have involved instances where a party seeks to enjoin incipient securities violations prior to their occurrence or completion, and instances where a party, who is not directly injured by a securities violation, is in a better position to protect the interests of an injured class than are the class members themselves. *See, e.g., Tully v. Mott Supermarkets, Inc.*, 540 F.2d at 194–95 (§ 10(b) of the Securities Exchange Act); *Crane Co. v. Harsco Corp.*, 511

F.Supp. 294, 299–302 (D.Del.1981) (§ 13(e) of the Securities Exchange Act); *Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468, 475–76 (E.D.Pa. 1978) (§ 14(e) of the Securities Exchange Act). In contrast, News International seeks injunctive relief primarily on its own behalf for injuries resulting from a transaction that has already been consummated and alleged securities violations that have already occurred. Essentially, News International seeks damages in equitable form.

More importantly, regardless of whether News International has standing to seek injunctive relief under § 17(a) of the Securities Act, News International fails to state a claim against Warner and its directors under § 17(a) for the same reasons that it fails to state a claim under § 10(b) of the Exchange Act. Therefore, News International's counterclaims against Warner and third-party claims against Warner's directors are dismissed with prejudice.

SECTION 10(b), 20, AND 17(a) CLAIMS AGAINST CHRIS–CRAFT, BHC, AND CHRIS–CRAFT'S DIRECTORS

■ News International contends that Chris-Craft, BHC, and Chris-Craft's directors have violated § 10(b) and § 20 of the Exchange Act, and § 17(a) of the Securities Act, by participating in, and aiding and abetting the § 10(b) and § 17(a) violations of Warner and its directors. However, News International's claims against Chris-Craft, BHC, and Chris-Craft's directors must fail by reason of News International's failure to state a claim against Warner and its directors. *See, e.g., IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980); *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799–800 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323

---

**14.** Other courts have split on the question of whether a private right of action exists under § 17(a) of the Securities Act. *Compare Landry v. All American Assurance Co.*, 688 F.2d 381, 384–91 (5th Cir.1982) (no private right of action exists); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (same); *Kimmel v. Peterson*, 565 F.Supp. 476, 482–88 (E.D.Pa.1983) (same); *Reid v. Mann*, 381

F.Supp. 525 (N.D.Ill.1974) (same), *with Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 815 (9th Cir.1981) (private right of action exists); *Lincoln National Bank v. Herber*, 604 F.2d 1038, 1040 n. 2 (7th Cir.1979) (same); *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979) (same); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir.1975) (same).

(1978). Therefore, News International's § 10(b), § 20 and § 17(a) third-party claims against Chris-Craft, BHC, and Chris-Craft's directors are dismissed with prejudice.

## RICO CLAIMS AGAINST WARNER AND ITS DIRECTORS

News International claims that Warner and its directors have violated § 1961 *et seq.* of the Racketeer Influenced and Corrupt Organizations Act (RICO) by committing acts of "racketeering" in entering into the W–CC Transaction, concealing an entrenchment scheme, and engaging previously in other fraudulent acts. Section 1962 of RICO prohibits any person from: (a) acquiring an interest in an enterprise with funds obtained through a pattern of racketeering activity; (b) acquiring or maintaining an interest in, or control of, an enterprise through a pattern of racketeering activity; or (c) conducting, or participating in the conduct of, an enterprise's affairs through a pattern of racketeering activity. Section 1961(1) of RICO enumerates specific illegal "predicate acts" which constitute "racketeering activity" under the statute, including mail fraud, wire fraud, and fraud in the sale of securities. Section 1961(5) of RICO defines a "pattern of racketeering activity" as the commitment of two or more predicate racketeering acts within a ten year period (one of which has occurred subsequent to the effective date of the statute). News International alleges that Warner's management has maintained control of Warner, and conducted Warner's affairs, through a pattern of racketeering by commiting mail fraud, wire fraud, and securities fraud in entering into the W–CC Transaction, concealing an entrenchment scheme, and engaging in prior fraudulent acts.

RICO was passed by Congress primarily as a tool to root out "the infiltration of legitimate business by organized crime." *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). *See* Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922. However, the statute was broadly framed to avoid creating an unconstitutional status offense; avoid creating unsurmountable proof problems; and attack the infiltration of legitimate business by persons who engage in racketeering activity but do not possess ties to recognized organized crime groups. *See, e.g.,* 116 Cong.Rec. 586 (1970) (remarks of Sen. McClellan); 116 Cong.Rec. 601 (1970) (remarks of Sen. Hruska); 116 Cong.Rec. 35,344 (1970) (remarks of Rep. Poff); *see generally,* Note *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1106–09 (1982). In an effort to strengthen the enforcement of RICO, Congress provided a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962" of the Act. RICO § 1964(c).

The broad scope of RICO, however, together with the provision of private rights of action under the Act, have created the risk of abusive private enforcement of the Act. Most any "garden variety" fraud claim can be creatively converted into at least a facially viable RICO claim. The simple filing of a RICO claim against a party can have a tremendous "in terrorem" effect and produce significant injury to the party's reputation as a result of the racketeering charges. Moreover, to the extent that a garden variety claim ultimately survives on its merits, traditional state and federal law compensatory remedies are preempted by heavily punitive treble damages.

With concern for these problems, many courts have attempted to place judicial limits on the scope of civil liability under RICO. Some courts have held that civil liability under RICO applies only to persons with ties to organized crime. *See, e.g., Minpeco, S.A. v. Conticommodity Services, Inc.,* 558 F.Supp. 1348, 1350–51 (S.D.N.Y.1983); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736, 747–48 (N.D.Ill.1981). *But see Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 21 (2d Cir.1983) (no requirement of nexus to organized crime); *Schacht v. Brown,* 711 F.2d 1343, 1353–56 (7th Cir.1983) (same); *Bennett v. Berg,* 685 F.2d 1053, 1063–64 (8th Cir.1982) (same). Other courts have held that plaintiffs must establish a special type of injury,

such as "competitive" or "commercial" injury, to state a claim under RICO. *See, e.g., Noland v. Gurley,* 566 F.Supp. 210, 218 (D.Colo.1983); *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207, 210–11 (N.D.Ill.1980). *But see Schacht v. Brown,* 711 F.2d at 1356–58 (no requirement of special injury); *Bennett v. Berg,* 685 F.2d at 1058–59 (same); *Kimmel v. Peterson,* 565 F.Supp. 476, 493–95 (E.D. Pa.1983) (same). Some courts have borrowed Justice Stewert's "I know it when I see it" analysis in evaluating RICO claims. *See Waste Recovery Corp. v. Mahler,* 566 F.Supp. 1466, 1468 (S.D.N.Y.1983) (*quoting Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (Stewert, J., concurring)); *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1360 n. 1 (S.D.N.Y.), *aff'd on other grounds,* 719 F.2d 5 (2d Cir.1983) (same). Many other courts appear to have implicitly applied this rule.

The parties in this suit have raised other perplexing issues concerning the scope of civil liability under RICO, such as whether a plaintiff, though not required to establish a "competitive" or "commercial" injury, must nevertheless establish injury resulting from § 1962 enterprise activity, as opposed to injury simply resulting from predicate racketeering acts, to state a claim under RICO, *compare In re Action Industries Tender Offer,* 572 F.Supp. 846, 851–52 (E.D.Va.1983) (requirement of § 1962 enterprise injury); *Guerrero v. Katzen,* 571 F.Supp. 714, 718–19 (D.D.C.1983) (same); *with In re Longhorn Securities Litigation,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,-630, at 97,482–83 (N.D.Okla.1983) (no requirement of § 1962 enterprise injury); *Kirschner v. Cable/Tel. Corp.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,589 at 97,327 (E.D.Pa.1983) (same); whether an "infil-

trated" enterprise may itself be liable under RICO, *compare United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (enterprise may not be liable); *D & G Enterprises v. Continental Illinois National Bank and Trust Co. of Chicago,* 574 F.Supp. 263, 270 (N.D.Ill.1983) (same); *with United States v. Hartley,* 678 F.2d 961, 987–90 (11th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983) (enterprise may be liable); *D'Iorio v. Adonizio,* 554 F.Supp. 222, 232–33 (M.D.Pa.1982) (same); and whether an implied private right of action for injunctive relief exists under RICO, *compare Kaushal v. State Bank of India,* 556 F.Supp. 576, 581–84 (N.D.Ill.1983) (no private right of action for injunctive relief exists), *and Trane Co. v. O'Connor Securities,* 718 F.2d 26, 28 (2d Cir.1983) (doubtful whether private right of action for injunctive relief exists); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983) (same); *with Aetna Casualty and Surety Co. v. Liebowitz,* 570 F.Supp. 908, 909–11 (E.D.N.Y.1983) (court might possess power to issue preliminary injunction).

The Court, however, need not reach these issues. For the Court finds that News International has not sustained an injury cognizable under RICO. News International's claims under RICO are substantially identical to its claims under § 10(b) of the Exchange Act.[15] In fact, the racketeering activity allegedly committed by Warner and its directors consists of their alleged § 10(b) (or § 17(a)) violations. News International fails to state a claim under RICO for the same reasons that it fails to state a claim under § 10(b) of the

---

**15.** News International does allege certain prior fraudulent acts by Warner's management under its RICO claims that it does not allege under its 10b–5 claims. However, it appears that News International alleges these acts only to establish a pattern of racketeering by Warner's management. News International has not alleged injury from these acts; nor can it. The acts occurred long before News International first acquired stock in Warner. They were "scandals" that received wide publicity at the time of their

occurrence, as acknowledged by News International in its pleadings. Furthermore, they have resulted in lawsuits against Warner, which Warner has disclosed in public documents filed with the SEC prior to News International's purchases of Warner stock. Any previous concealment of these acts by Warner's management has been cured by Warner's disclosures in its SEC filing, if not by the publicity the acts received at the time of their occurrence. *See Seibert v. Sperry Rand Corp.,* 586 F.2d 949, 952 (2d Cir.1978).

Exchange Act. Although News International does allege that the racketeering activity consists of mail fraud and wire fraud, as well as fraud under the securities laws, the Court's research has turned up no cases that would support a contrary conclusion with respect to mail fraud or wire fraud. The Court's holding with respect to News International's § 10(b) claims is not based upon technical points of law unique to § 10(b). Rather, the Court's holding is based upon fundamental principles of law which are equally applicable to claims of mail fraud or wire fraud. Therefore, the Court dismisses with prejudice News International's RICO counterclaims against Warner and third-party claims against Warner's directors.

## SECTION 13(d) CLAIMS AGAINST WARNER AND ITS DIRECTORS

News International alleges that, in undertaking the W–CC Transaction, Warner and its directors have formed a § 13(d)(3) "group" with Chris-Craft, BHC, and Chris-Craft's directors for the purpose of holding a "veto block" of Warner's stock to prevent a hostile takeover of Warner. News International claims that Warner and its directors have violated § 13(d) of the Exchange Act by failing to disclose the existence of this group in a 13D Statement.

News International's claim raises the threshold question of whether "management groups" are subject to the disclosure provisions of § 13(d). There is some authority to support the general proposition that management—shareholders, like any other shareholders, are subject to § 13(d)'s disclosure provisions. *See Podesta v. Calumet Industries, Inc.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,433 at 93,559–560 (N.D.Ill.1978); *Tony Lama Company, Inc.*, [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,901 (S.E.C. May 14, 1974); *see also GAF Corp. v. Milstein*, 453 F.2d 709, 719 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972) (dictum); *Bath Industries v. Blot*, 427 F.2d 97, 109 (7th Cir.1970) (dictum). *But see Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 62 (D.N.J.1974) (§ 13(d) not applicable to management's

purchase of company assets); *see also Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 218 (2d Cir.1973) (§ 13(d) not applicable in takeover battle, where § 13(d) would simply duplicate § 14(d)'s disclosure requirements); *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145, 1161 (S.D.N.Y.1977) (same).

This Court, however, possesses serious doubts whether § 13(d)'s disclosure obligations should be broadly construed to apply to management groups *per se*. Corporate officers and directors are required to disclose their beneficial ownership of company stock in public documents regularly filed with the SEC. It is common knowledge that officers and directors generally possess a mutual interest in maintaining their corporate positions. *See, e.g., Brayton v. Ostrau*, 561 F.Supp. at 165; *Tyco Laboratories v. Kimbell*, 444 F.Supp. at 298; *Falkenberg v. Baldwin*, [1977–1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 91,911. This fact, in and of itself, serves as notice to investors of the existence of a "management group." Management's interest in maintaining corporate control should not be turned on its head and used as a basis for a § 13(d)(3) claim any time a management group that collectively owns 5% or more of a company's stock undertakes some action, which is itself disclosed, that serves to perpetuate management's control. Management is not obligated under the federal securities laws to publicly admit to engaging in an entrenchment scheme. *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d at 288; *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. at 1291; *Bucher v. Shumway*, [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 96,299–300; *Tyco Laboratories v. Kimbell*, 444 F.Supp. at 298; *Jewelcor, Inc. v. Pearlman*, 397 F.Supp. at 249. Section 13(d) should not be permitted to be used as a vehicle to circumvent this principle.

If a management group, however, engages in a voting or pooling arrangement with third parties, the arrangement should be subject to the disclosure provisions of § 13(d). *See Jewelcor, Inc. v.*

*Pearlman,* 397 F.Supp. at 243–44. Such an arrangement might significantly alter the control structure of a company and effectively enlarge the contours of the management group beyond the scope that investors would ordinarily presume. News International has alleged the existence of such an arrangement between Warner's directors, Chris-Craft, BHC, and Chris-Craft's directors. The circumstances surrounding the W–CC Transaction provide a sufficient inference of the existence of a § 13(d) group to sustain News International's claim against the present motions to dismiss. Further determination of the merits of this claim must await a fuller development of the facts.

News International, however, has further alleged that Warner is a member of this § 13(d) group. It strains the construction of § 13(d) to argue that an issuer can be part of a § 13(d)(3) group formed for the purpose of holding or acquiring its own stock. Warner does not own outstanding shares of its own stock, nor may it own such shares. It is true that Warner was a party to the W–CC Transaction. In addition, the cross-ownership of stock between Warner and BHC complicates matters somewhat. Nevertheless, the Court has found no authority to support the proposition that an issuer may itself be subject to the disclosure provisions of § 13(d). Nor would such a rule advance the policies underlying § 13(d). Requiring Warner to file a 13D Statement would not produce any significant information regarding the alleged § 13(d) group's activities that would not otherwise be disclosed in the filings of the other group members. To the contrary, requiring Warner to file a 13D Statement might confuse some investors. Allowing News International to pursue its § 13(d) claim against Warner would simply generate litigation costs, much of which would ultimately be incurred by the intended beneficiaries of the § 13(d) claim, Warner's shareholders.

For the foregoing reasons, News International's § 13(d) third-party claims against Warner's directors are not dismissed; however, News International's § 13(d) counterclaim against Warner is dismissed with prejudice.

## SECTION 13(d) CLAIMS AGAINST CHRIS–CRAFT, BHC, AND CHRIS-CRAFT'S DIRECTORS

News International claims that Chris-Craft and BHC, together with Chris-Craft's directors, have violated § 13(d) of the Exchange Act by filing a late and false and misleading 13D Statement disclosing their purchases of Warner stock. News International alleges that the 13D Statement fails to disclose the existence of a § 13(d)(3) group composed of Chris-Craft, BHC, Chris-Craft's directors, Warner, and Warner's directors, which, as discussed above, has allegedly been formed for the purpose of holding a "veto block" of Warner's stock. In addition, News International claims that the 13D Statement contains other materially misleading omissions concerning the purpose, terms and effects of the W–CC Transaction. These omissions generally relate to the alleged entrenchment purpose and entrenchment effects of the W–CC Transaction. News International also alleges, however, that as a result of the W–CC Transaction, Chris-Craft and BHC have become unregistered investment companies in violation of the Investment Company Act of 1940,[16] and have failed to disclose this fact in their 13D Statement.

In response to these claims, Chris-Craft and BHC have filed an Amendment to their 13D Statement that contains News International's pleadings as an exhibit. The Amendment very briefly discusses this lawsuit, focusing in particular upon News International's allegations that Chris-Craft and BHC are operating as unregistered investment companies in violation of the Investment Company Act of 1940. The Amendment refers to News International's attached pleadings for further exposition of each of News International's claims. Chris-Craft and BHC contend that this Amendment to their 13D Statement cures any material omissions in their original 13D Statement.

---

**16.** 15 U.S.C. § 80a–1 *et seq.* (1976).

Chris-Craft and BHC have raised a very significant issue concerning the scope of disclosure obligations under § 13(d). That is, to what extent may a party cure any falsities or omissions in a 13D Statement by filing an Amendment to the 13D Statement that discloses adverse claims which allege the falsities or omissions? Disclosing the adverse claims, of course, may satisfy a party's disclosure obligations pending ultimate resolution of the merits of the claims. However, the question arises of whether disclosures of the adverse claims completely satisfies 13(d)'s disclosure obligations and moots any issue as to the ultimate merits of the claim. Permitting this type of cure would eliminate costly and often vexatious litigation under § 13(d). Nevertheless, it might also significantly circumvent the disclosure goals of § 13(d). Material facts might often be concealed and omitted from initial 13D Statements, to be cured only by subsequent disclosure of adverse claims which allege the omissions but which are disputed by the disclosing party. As a result, the true facts would often remain obscured and hidden from investors. For this reason, the Court finds that Chris-Craft's and BHC's Amendment to their 13D Statement does not necessarily cure the alleged omissions in the 13D Statement.

As discussed above, if Chris-Craft, BHC, and Chris-Craft's directors have formed a § 13(d)(3) group with Warner's directors for the purpose of holding and acquiring Warner stock, the existence of this group must be disclosed in a 13D Statement. *See Jewelcor, Inc. v. Pearlman*, 397 F.Supp. at 243–44. Chris-Craft's and BHC's Amendment to their 13D Statement, which discloses News International's allegations of the existence of this group, does not satisfy § 13(d)'s disclosure requirements. The net effect of the Amendment is to inform investors of the possibility of the group's existence, rather than the fact of the group's existence. If a § 13(d)(3) group does exist, this fact must be disclosed, not the possibility of the fact. Whether such a group exists is a factual issue that cannot be determined on the present motions to dismiss.

Similarly, Chris-Craft's and BHC's Amendment to their 13D Statement which discloses News International's allegations of the true purpose of the W–CC Transaction, does not fulfill § 13(d)'s disclosure requirements as to the purpose of the transaction. Chris-Craft and BHC are not obligated to disclose any illicit entrenchment scheme underlying the W–CC Transaction. *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d at 288; *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. at 1291; *Bucher v. Shumway*, [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 96, 299–300; *Tyco Laboratories*, 444 F.Supp. at 298; *Jewelcor, Inc. v. Pearlman*, 397 F.Supp. at 248. Nevertheless, if the W–CC Transaction was undertaken for the purpose of detering a hostile takeover of Warner, this presently undisclosed purpose, which is itself neither illegitimate nor legitimate, must be disclosed. Although the federal securities laws do not require a person to publicly confess to engaging in illegitimate or illegal conduct, the securities laws do require disclosure of material facts relating to a person's action. In this respect, § 13(d) and rules promulgated thereunder expressly require disclosure of a person's purpose for acquiring 5% or more of a company's stock. News International has challenged the sufficiency and truthfulness of Chris-Craft's and BHC's disclosure of the purpose of the W–CC Transaction; the Court may not rule upon the merits of this factual claim on the present motions to dismiss.

However, Chris-Craft's and BHC's Amendment to their 13D Statement potentially has cured all other alleged omissions in the 13D Statement concerning the terms and effects of the W–CC Transaction. These alleged omissions generally consist of undisputed facts, such as Warner's present 20% voting interest in BHC and Warner's supermajority charter provisions, which have now been disclosed in the 13D Statement by means of News International's attached pleadings. Nevertheless, there might be some question as to the sufficiency of News International's summary "disclosures" of these facts in its plead-

ings, as well as the sufficiency of these "buried" disclosures in an exhibit to the 13D Statement. Moreover, the sufficiency of some of these disclosures might depend, in part, upon the presently unresolved issues regarding the purpose of the W–CC Transaction and the existence of a § 13(d)(3) group with respect to the transaction. Therefore, the Court defers ruling upon the sufficiency of these disclosures.

 Finally, Chris-Craft and BHC have potentially satisfied their § 13(d) disclosure obligations concerning their alleged violations of the Investment Company Act of 1940, by disclosing News International's allegations of the violations in their Amendment to their 13D Statement. The federal securities laws may require a party to disclose legal violations, and other legal consequences, resulting from the party's actions if such information is material to investors for reasons other than simply revealing the culpability of the actions. However, if the party in good faith disputes the violations, the party need only disclose the possibility of the violations. *See Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121, 1124–26 (S.D.N.Y.1980); *Copperweld Corp. v. Imetal*, 403 F.Supp. 579, 606 (W.D.Pa.1975); *Ronson Corp. v. Liquifin Aktiengesellschaft*, 370 F.Supp. 597, 608 (D.N.J.), *aff'd per curiam*, 497 F.2d 394 (3d Cir.), *cert. denied*, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). In general, a party's disclosure obligations under the securities laws extend no further than good faith disclosure of all material information within the party's scope of knowledge. A party may not be held hostage under the securities laws in order to inform investors with complete certainty of all of the legal implications and consequences of the party's actions. Moreover, the disclosure provisions of the securities laws may not be used as an indirect vehicle for litigating any and all of a party's sins.

Nevertheless, at this point in the proceedings, the Court is unable to determine whether Chris-Craft and BHC genuinely and in good faith dispute News International's allegations that the companies are operating in violation of the Investment Company Act of 1940. Furthermore, the Court is unable to determine the sufficiency of Chris-Craft's and BHC's brief disclosure of the potential violations in their 13D Statement. Therefore, the Court defers ruling upon the sufficiency of the disclosure.

For the foregoing reasons, the Court does not dismiss News International's § 13(d) third-party claims against Chris-Craft, BHC, and Chris-Craft's directors.

CONCLUSION

The Court cannot help but conclude that, in this suit, News International has simply attempted to dress up state law claims of breach of fiduciary duty into federal securities law and RICO claims. News International has filed suit in the Delaware Court of Chancery on the basis of its state law claims and now attempts to obtain "two bites of the apple" with its federal law claims. With the exception of News International's § 13(d) claims, News International fails to state a cognizable claim under the securities laws or RICO.

An Order will be entered in accordance with this Opinion.