USG CORPORATION, a Delaware corporation, and Morris M. Cottle, individually and in a derivative capacity, Plaintiffs,

v.

WAGNER & BROWN, et al., Defendants.

Nos. 87 C 9399, 87 C 9455.

United States District Court, N.D. Illinois, E.D.

Feb. 22, 1988.

Stephen C. Neal, P.C., Kevin T. Van Wart, Kirkland & Ellis, Chicago, Ill., for USG Corp.

Frederic F. Brace, Jr., Ellen A. Rubel, Stephen C. Neal, Emily Nicklin, Kevin T. Van Wart, Kirkland & Ellis, Chicago, Ill., for Morris M. Cottle.

Don H. Reuben, John R. McCambridge, Isham, Lincoln & Beale, Chicago, Ill., for defendants.

Robert S. Rifkind, Douglas D. Broadwater, Cravath, Swaine & Moore, New York City, pro hac vice, for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

On October 29, 1987 USG Corporation ("USG") filed a complaint in this court against defendants Wagner & Brown; Cyril Wagner, Jr.; Jack E. Brown; CY–57, Inc.; JACK–57, Inc.; Silverado Investments, Inc.; Soffit Corporation; and Desert Partners, L.P. USG seeks preliminary and injunctive relief against defendants for allegedly unlawful conduct in connection with their accumulation of USG stock. (Case No. 87 C 9399). On November 2, 1987 Morris M. Cottle, a shareholder of USG, filed a similar action against defendants in Judge Plunkett's court. (Case No. 87 C 9455). This court consolidated the two actions on November 4, 1987.

Plaintiffs have moved for a preliminary injunction pursuant to Fed.R.Civ.P. 65. For the following reasons, plaintiffs' motion for a preliminary injunction is denied.

### BACKGROUND FACTS [1]

#### A. *Parties and General Background*

Plaintiff USG Corporation ("USG") is a publicly held Delaware corporation with its executive offices and principal place of business in Chicago, Illinois. USG is a diversified manufacturer of building products. Plaintiff Morris M. Cottle is a shareholder of USG and a citizen of Illinois. He brings this derivative action on behalf of himself and all current USG shareholders. USG and Mr. Cottle seek injunctive relief against defendants based upon what plaintiffs claim is the defendants' allegedly unlawful accumulation of USG stock.

Defendant Wagner & Brown is a 50%–50% Texas general partnership owned by Cyril Wagner, Jr. and Jack E. Brown. Desert Partners, L.P. ("Desert Partners") is a Texas limited partnership. CY–57, Inc. and JACK–57, Inc. are general partners of Desert Partners owning a 38.89% interest each. Mr. Wagner and Mr. Brown are sole shareholders of CY–57, Inc. and JACK–57, Inc., respectively. Silverado Investments, Inc. and Soffit Corporation are limited partners of Desert Partners owning an 11.11% interest each.

By September 23, 1987 Wagner & Brown affiliates had acquired more than five percent of the common stock of USG. Desert Partners currently holds 5,079,800 shares, which is approximately 9.39% of USG's outstanding shares.[2] However, neither Desert

---

1. The parties have informed the court that the facts are not in dispute and have waived a hearing on the preliminary injunction.

2. Wagner & Brown first began acquiring USG stock in July, 1987 through Stanton Partners, a Texas general partnership that was formed in May 1987 between two other corporations owned by Mr. Wagner and Mr. Brown. From July 29, 1987 through August 3, 1987 Stanton Partners acquired approximately $12.1 million of USG stock. On August 17, 1987 Bristol Part-

ners, L.P. purchased all of the shares of USG stock which had been acquired by Stanton Partners. Bristol Partners was a limited partnership with CY–57 and JACK–57 as general partners and Silverado Investments and Soffit Corporation as limited partners. On October 5, 1987 Bristol Partners changed its name to Desert Partners.

Partners nor any of its partners has purchased or sold any USG stock since October 5, 1987.

### B. *The Schedule 13D Filings*

Defendants filed their first Schedule 13D on October 5, 1987, disclosing Desert Partners' acquisitions of USG stock. Under Item 4, "Purpose of Transaction," the October 5 Schedule 13D recited a list of alternatives that Wagner & Brown either were considering or were authorized by their partnership agreement to pursue. These included proposing or seeking to acquire control of the entire equity interest in USG, proposing that USG effect a recapitalization or similar restructuring after which Wagner & Brown would hold a major or controlling interest in USG, acquiring a more substantial equity position in USG, seeking less than a majority of shares, proposing a merger with a Wagner & Brown affiliate, developing a restructuring or recapitalization plan in which defendants would or would not participate other than as a holder of common stock, seeking representation on the USG Board of Directors, holding USG stock for investment purposes only, selling all or part of its shares, or engaging in any combination of these actions.

On October 27, 1987 defendants filed a second Schedule 13D which disclosed that they had decided to seek to acquire control of USG. The second Schedule 13D also disclosed that Desert Partners had made the following efforts to arrange financing for a tender offer: (1) they had retained Prudential–Bache to act as their exclusive financial advisor; (2) they were discussing with Prudential–Bache and certain commercial banks the feasibility and availability of financing; and (3) they had discussed obtaining a margin loan from an affiliate of Prudential–Bache to finance the acquisition of additional USG stock. Finally, the second Schedule 13D disclosed that Desert Partners was attempting to arrange a meeting with USG management.

On October 28, 1987 representatives of USG met with the defendants' representatives. USG was represented at the October 28 meeting by Mr. Robert Day, its Chairman, and Mr. Eugene Miller, its Vice–Chairman and Chief Financial Officer. Defendants were represented by Mr. Wagner, Mr. Brown and Mr. Joel Reed, Vice–Chairman of CY–57, Inc.[3] During this meeting, Mr. Reed suggested that "it would be possible, working together with the company in a negotiated transaction with our partnership, to achieve a value in excess of $50 per share." (Reed Dep. at 169–70).[4] However, USG representatives made it clear to the representatives of Desert Partners during the meeting that USG management was not interested in a negotiated transaction.

Desert Partners filed a third Schedule 13D on October 29, 1987. In the third Schedule 13D, defendants disclosed that the meeting had occurred the day before, but that "no substantive negotiations had occurred." Defendants also represented that, during the meeting, Desert Partners had "stated that they believe in a negotiated transaction with the partnership, it would be possible to provide [USG's] stockholders with value in excess of $50 per share even though in light of existing market conditions an offer at a lower price would be attractive to stockholders."

On November 2, 1987 defendants filed a fourth Schedule 13D disclosing that they were "considering a tender offer to be made directly to [USG's] stockholders," and that "any decision to commence a

---

3. USG's Proposed Findings of Fact state that Mr. Reed is Wagner & Brown's Chief Financial Officer. The court cannot find evidence to support this proposed finding. Mr. Reed's Affidavit states that he is "Vice–President of CY–57, Inc., a Texas corporation wholly owned by Cyril Wagner, Jr. that serves as the administrative (in effect, the managing) partner of Desert Partners, L.P." (Reed Aff. ¶ 1).

4. Due to the numerous exhibits submitted in this case in support of the motion for and in opposition to the preliminary injunction, the court will identify all exhibits by referring to the name of the affiant or deponent first and then the paragraph or page of the document in question. For example, "Reed Dep. at 1" refers to the first page of Mr. Reed's deposition. "Reed Aff. ¶ 1" refers to the first paragraph of Mr. Reed's affidavit.

tender offer would depend on, among other factors, the availability of financing on terms acceptable to the Partnership." The fourth Schedule 13D also disclosed that the FTC had begun an investigation to determine whether defendants had violated the Hart–Scott–Rodino Antitrust Improvements Act (the "H–S–R Act") in connection with their acquisition of USG stock. Finally, the fourth Schedule 13D disclosed that USG had filed a lawsuit against defendants. Defendants appended a copy of the complaint to their fourth Schedule 13D filing.

At some point between the October 28 meeting and November 2, the date on which defendants filed the fourth Schedule 13D, defendants decided to launch a tender offer. The tender offer was to have commenced on November 2, 1987. On November 1, 1987, however, defendants postponed the contemplated tender offer because of problems in arranging the necessary financing (Dickman Dep. at 158; Martin Dep. at 152; Wagner Dep. at 137) and drafting the appropriate documents (Reed Dep. at 196; Dickman Dep. at 159; Fowler Aff. ¶ 17). On November 4, 1987 Prudential Insurance, parent corporation of Prudential–Bache, determined that it would not approve Prudential–Bache's financing of Desert Partners' tender offer because of the hostility of USG management toward the transaction. (Fowler Aff. ¶ 18). Consequently, Desert Partners postponed the tender offer indefinitely.

The draft tender offer document that defendants had completed in preparation for the November 2, 1987 tender offer indicates that if defendants acquired control of USG, they intended to abolish USG's cash dividends:

> After consummation of the offer, Desert Partners and Purchaser presently intend to cause the Company to cease paying cash dividends (other than dividends payable on the Convertible Preferred).

(USG's Appendix of Exhibits and Affidavits, Tab 9, p. 37). The draft document also shows defendants had a plan to change USG's present capitalization by refinancing over $600 million in bond indebtedness under USG Bond Indenture Agreements. These facts were not disclosed in the fourth Schedule 13D.

## DISCUSSION

In order to obtain a preliminary injunction, plaintiff must show

> (1) that it has no adequate remedy at law;
>
> (2) that it will suffer irreparable harm if the preliminary injunction is not issued;
>
> (3) that the injunction will not harm the public interest;
>
> (4) that it has a reasonable likelihood of prevailing on the merits; and
>
> (5) that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted.

*Curtis v. Thompson,* 840 F.2d 1291, 1295 (7th Cir.1988), citing *Brunswick Corp. v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986). Plaintiffs bear the burden of establishing each of the five elements necessary for the issuance of a preliminary injunction. *Brunswick Corp.,* 784 F.2d at 273.

A. *No Adequate Remedy at Law, Irreparable Harm, and the Public Interest Elements*

■ Plaintiffs have met their burden of proof on the first three elements of a preliminary injunction. USG and Mr. Cottle have shown that they have no adequate remedy at law because the interests of existing shareholders may require injunctive relief to remedy the injury caused by Desert Partners' allegedly tainted acquisitions of stock. *See Champion Parts Rebuilders, Inc. v. Cormier Corp.,* 650 F.Supp. 87, 89 (N.D.Ill.1986). Plaintiffs have also shown that irreparable harm may befall them if the injunction does not issue (assuming that plaintiffs prevail on the merits) because any transactions which occur on the basis of misleading information cannot be unscrambled. *See USG Corp. v. Wagner & Brown,* 690 F.Supp. 625 (N.D.Ill.1987). Finally, the public interest certainly will not be disserved by an injunction which remedies abuses caused by violations of the securities laws and prevents further such abuses.

B. *Likelihood of Success on the Merits Element*

The Seventh Circuit has clearly established that in order to sustain its burden of proof on a motion for preliminary injunction, a plaintiff, in addition to establishing the elements discussed above, must demonstrate some probability of success on the merits. *Curtis,* at 1296, citing *Brunswick Corp.,* 784 F.2d at 275. This element's "threshold is low. It is enough that the plaintiff's chances are *better than negligible."* *Curtis,* at 1296 (quoting *Brunswick Corp.,* 784 F.2d at 275 which quoted *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir.1984), with emphasis added).

Plaintiffs' version of the circumstances surrounding Desert Partners' USG stock purchases requires the court to draw considerable inferences from what appear to be primarily neutral factual allegations. Plaintiffs theorize that initially Wagner & Brown fully intended to acquire control of USG. Plaintiffs contend that to implement its scheme, Wagner & Brown allegedly made its initial purchase through a complex structure of limited and general partnerships which allowed Desert Partners' affiliates to acquire a substantial block of USG stock without triggering the reporting requirements of H–S–R. Evading the H–S–R filing requirements allegedly enabled Desert Partners to accumulate $225 million of USG stock at reduced prices without alerting the market to the possibility of a tender offer.

However, plaintiffs contend that the stock market crash of October 19, 1987 forced Wagner & Brown to abandon its plan to acquire control of USG. According to plaintiffs, the sudden drop in the price of USG stock caused Desert Partners to incur $100 million in "paper losses." As a result of these losses, Desert Partners allegedly filed several "cleverly crafted Schedules 13D designed to boost the trading price of USG stock and reduce the massive losses defendants had suffered." (USG's Memo-randum in Support of its Preliminary Injunction at 2). For example, Desert Partners' third Schedule 13D reported that Desert Partners believed that it could provide USG shareholders with value in excess of $50 per share. Plaintiffs believe that Desert Partners never intended to make such an offer to shareholders, but rather commented on this possibility to stimulate activity in USG stock and thereby inflate the trading price.

Plaintiffs seek injunctive relief in order to prevent Wagner & Brown from further implementing its scheme, and present four substantive bases which plaintiffs believe warrant injunctive relief: (1) Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d); (2) Section 14(d) of the Williams Act; (3) the reporting requirements of H–S–R, 15 U.S.C. § 18a; and (4) Section 10(b) of the Securities and Exchange Act.

1. Violations of Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d)

Congress passed the Williams Act in 1968 in response to the increased use of cash tender offers in corporate acquisitions. *Edgar v. MITE Corp.,* 457 U.S. 624, 632, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982). The purpose of the Williams Act was to ensure that shareholders who are confronted with a cash tender offer for their stock will not be required to respond without adequate information. *Edgar,* 457 U.S. at 633, 102 S.Ct. at 2636; *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 55 (2d Cir.1985). In pursuing this purpose, however, Congress wished to avoid favoring either the takeover bidder or management. *Edgar,* 457 U.S. at 633, 102 S.Ct. at 2636. Congress intended to strike a balance between the investor, the management, and the company pursuing the takeover. *Id.* at 634, 102 S.Ct. at 2636.

Accordingly, Section 13(d) of the Williams Act imposes certain disclosure requirements upon the takeover bidder. Section 13(d) requires any person who is directly or indirectly the beneficial owner of more than 5 percent of the stock of a corporation to file a statement containing material information regarding (1) the

background and identity of the acquiring persons; (2) the source and amount of the funds used in making the purchases; (3) if the purpose of the purchases is to acquire control of the issuer, any plans to make any major change in its business or corporate structure; (4) the number of shares of the security which the acquiring person beneficially owns; and (5) whether the acquiring person has any contracts, agreements, or obligations regarding the issuer's stock. 15 U.S.C. §§ 78m(d)(1)(A)–(D). In addition, Section 13D requires the reporting person to amend its report if any material change occurs in the facts set forth in the statements. 15 U.S.C. § 78m(d)(2).

Section 13(d) requires a potential bidder only to disclose material information. The Supreme Court has held that an omitted fact is material if a reasonable shareholder would consider it important in deciding how to vote his shares. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id. See also Flamm v. Eberstadt*, 814 F.2d 1169, 1174 (7th Cir.1987); *Securities and Exchange Commission v. Texas Intern. Co.*, 498 F.Supp. 1231, 1245 (N.D.Ill.1980).[5]

### a. *October 5 Schedule 13D*

■ Plaintiffs' evidence does not indicate that Desert Partners' first Schedule 13D was false and misleading. Plaintiffs maintain that the first Schedule 13D is misleading because defendants did not disclose that, at the time they made the first 13D filing, defendants fully intended to acquire control of USG. Plaintiffs present the deposition testimony of Silverado Investments, per Norbert Dickman, to support their theory. Mr. Dickman testified that Silverado Investments

understood the venture to be the formation of a partnership for the acquisition of a sizeable block of stock in a publicly traded corporation, that the cash expended would be approximately $225 million, and that *this partnership would proceed to attempt to obtain control of this corporation.*

(Dickman Dep. at 46) (emphasis added).

Defendants contend that the first Schedule 13D accurately reflected Desert Partners' intentions as of October 5, 1987. Mr. Reed testified that between August 17, 1987 and October 4, 1987 acquiring control of USG was "one of the options" Desert Partners was considering and that this option "became closer to the top of the list of the various options that [they] still had under consideration at that time." (Reed Dep. at 103). However, Mr. Reed also mentioned that Desert Partners may have initially desired to acquire less than ten percent of USG's outstanding shares, and also considered (1) suggesting a recapitalization, (2) purchasing more shares on the open market, and (3) selling its shares of USG stock. (Reed Dep. at 74–75). These intentions are consistent with the purposes listed under Item 4 of the first Schedule 13D.

Mr. Dickman's testimony does not establish that Desert Partners should have disclosed in its October 5 filing a concrete intention to acquire control of USG. Mr. Reed explained that Desert Partners' representatives mentioned the takeover option to Silverado representatives to explain why Desert Partners might need the additional equity that Silverado would contribute to the venture. (Reed Dep. at 43). Mr. Dickman's comment at his deposition, standing alone, does not establish that Desert Partners entertained the concrete intention to acquire control of USG when they filed the first Schedule 13D.[6] His testimony indicates only that the Wagner & Brown repre-

---

**5.** Although *TSC Industries, Inc. v. Northway, Inc.* dealt with "materiality" under the proxy rules, the Seventh Circuit has taken the definition in *TSC* as suitable for the term wherever it appears in securities law. *Flamm*, 814 F.2d at 1174.

**6.** Mr. Dickman's testimony is also unpersuasive because the portions of the deposition presented to the court as exhibits to plaintiffs' memorandum do not indicate when this conversation took place or between whom. The court cannot guess at the import or inference contained within deposition testimony.

sentative who solicited Silverado's participation mentioned the takeover option during their negotiations with Silverado representatives. This evidence is not enough to establish that Desert Partners' first Schedule 13D was false and misleading when filed.

### b. *October 27 Schedule 13D*

 Desert Partners also made adequate disclosure concerning the status of their financing in their second Schedule 13D. Plaintiffs contend that the second Schedule 13D is misleading because defendants failed to disclose certain adverse developments affecting their efforts to obtain financing for the acquisition.[7]

Desert Partners was not required to disclose their initial agreement with Prudential–Bache in a Schedule 13D. This contract was neither a contract concerning USG securities under Item 6 of the Schedule 13D (entitled "Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer") nor evidence of Wagner & Brown's purpose concerning USG under Item 4 ("Purposes of the Transaction"). Rather, this contract was a private contract between Desert Partners and Prudential–Bache concerning financial services. As of October 15, Prudential–Bache's part in the USG transaction was solely to provide financial information to Desert Partners concerning USG's value as an investment.[8] Desert Partners had not retained Prudential–Bache at that time either to provide financing itself or to assist in obtaining financing for an acquisition. Consequently, Section

13(d) did not require Desert Partners to disclose the October 15 agreement.

 Further, the facts that Toronto–Dominion Bank, with which Desert Partners had negotiated financing for the tender offer of USG shares, refused to participate in any non-negotiated transaction, and that Desert Partners had decided not to take advantage of an available margin loan at Prudential–Bache were not material facts required to be disclosed under Section 13(d). Section 13(d) allows individuals to discuss the possibility of future agreements without filing under the securities laws, *Pantry Pride, Inc. v. Rooney,* 598 F.Supp. 891, 900 (S.D.N.Y.1984), and does not require parties to disclose the results of financing negotiations which do not succeed. Congress could not have intended a tender offeror to file a Schedule 13D each time they negotiated the possibility of financing with a new source. Not only would disclosure of these sorts be unhelpful to investors in the marketplace, but Desert Partners may have even needlessly confused the marketplace by filing such Schedules 13D. Consequently, Desert Partners' second Schedule 13D was not false or misleading.

### c. *November 2 Schedule 13D*

 Moreover, Desert Partners did not mislead the investing public by disclosing the possibility that they may launch a tender offer directly to USG's shareholders.[9] In the fourth Schedule 13D, Desert Partners stated that

---

7. Specifically, plaintiffs contend that Desert Partners
 a. waited two weeks to disclose the fact that they had retained Prudential–Bache as their financial advisor;
 b. failed to disclose that on October 30, 1987 Toronto–Dominion Bank refused to finance the acquisition; and
 c. failed to disclose the results of margin loan discussions with Prudential–Bache.

8. Desert Partners did disclose in the second Schedule 13D a letter dated October 26, 1987 memorializing Desert Partners' more substantial agreement with Prudential–Bache. In this contract, the parties agreed that the amount of any additional fees that Desert Partners would pay to Prudential–Bache was conditioned on Desert

Partners acquiring control of USG. This agreement therefore constituted a contract concerning USG securities under Item 6 of the Schedule 13D. Moreover, a reasonable investor might find this agreement material to an investment decision. Consequently, Section 13(d) required Desert Partners to disclose this information, and Desert Partners complied in its second Schedule 13D.

9. Plaintiffs contend that the fourth Schedule 13D is misleading because defendants
 a. disclosed their tender offer plans despite the fact that they knew before the date of the fourth filing that Prudential–Bache wouldn't finance the acquisition.

the partnership is considering a tender offer to be made directly to the [USG's] stockholders. Any decision to commence a tender offer would depend on, among other factors, the availability of financing on terms acceptable to the partnership.

This statement accurately reflected Desert Partners' intentions at the time. The evidence shows that on the date Desert Partners filed the fourth Schedule 13D its representatives had attempted to commence an offer on November 2, 1987 but had been thwarted by problems drafting the necessary documents and securing the necessary financing. Therefore Wagner & Brown abandoned its November 2 deadline, but not its plan to commence an offer. The fourth Schedule 13D neither implied that the tender offer was imminent nor that Desert Partners had secured financing. Rather, Desert Partners explicitly conditioned its ability to make a tender offer on the availability of financing. Consequently, the fourth schedule was not misleading.

■ Moreover, Section 13(d) did not require Desert Partners to disclose the fact that they might discontinue USG's dividends policy after launching a successful tender offer. Desert Partners neither commenced a tender offer nor disclosed a concrete intention to do so. Section 13(d) does not require a company to disclose all of the ramifications of actions it considers but has not yet decided to pursue. Desert Partners therefore did not violate Section 13(d) by failing to disclose the terms of an offer which might or might not have occurred. Consequently, the fourth Schedule 13D was not misleading.

> b. failed to disclose that they would discontinue USG's dividends policy if they acquired control of the company.

10. Plaintiffs contend that the third Schedule 13D is misleading because
> a. Desert Partners implied that they had engaged in negotiations with USG management when none, in fact, had occurred.
> b. Desert Partners represented that they could offer $50/share, but they actually had neither the plans nor the financing commitments to make such an offer.

### d. *October 29 Schedule 13D*

■ On the other hand, plaintiffs' evidence indicates that they have a "better than negligible" probability of proving that the contents of Desert Partners' third Schedule 13D may have misled the investing public.[10] The evidence indicates that defendants may have disclosed their possible $50.00 per share offer in order to inflame the market for USG stock.

In the third Schedule 13D, Desert Partners stated that

> [d]uring [the October 28 meeting] the Partnership's representatives stated that they believe that in a negotiated transaction with the Partnership, it would be possible to provide the Company's stockholders with value in excess of $50 per share. . . .

Mr. Reed did make this statement at the October 28 meeting (Reed Dep. at 169; Day Dep at 81) and Desert Partners did believe that this value was possible (Brown Dep. at 158; Fowler Aff. ¶ 10; Reed Aff. ¶ 30). Thus, the statement was true on its face.

However, it was clear that no negotiations as yet had occurred.[11] Moreover, it appeared clear to the representatives of both sides after the meeting that USG managers were not receptive to the idea of a negotiated transaction. (Brown Dep. at 159; Dickman Dep. at 151; Miller Dep. at 292; Reed Dep. at 169). Because a negotiated transaction was not likely at the time of the October 29 filing, it is possible that Desert Partners diclosed the possibility of an offer in order to stimulate interest in USG stock among possible investors and thereby drive up the price of stock.

11. Desert Partners did not imply that negotiations had occurred between their representatives and USG managers at the October 28, 1987 meeting. In fact, Desert Partners candidly stated in the third Schedule 13D that "[n]o substantive negotiations occured [sic] during such discussions and no further discussions have been scheduled." This statement accurately reflected both sides' perception of the outcome of this meeting. *See, e.g.,* Brown Dep. at 159; Dickman Dep. at 151; Miller Dep. at 292; Reed Dep. at 170.

It is also possible that Desert Partners did, indeed, structure the content and timing of all four Schedules 13D to inflate the price of the stock. Plaintiffs have not presented any direct evidence of such a scheme, and, indeed, have asked the court to draw substantial inference from their evidence. However, as stated earlier in this opinion, the threshold for proving a likelihood of success on the merits is low. *Brunswick Corp.*, 784 F.2d at 275.

Taking the four Schedules 13D together, and drawing the inference that Desert Partners filed these schedules in furtherance of a scheme to inflate the price of USG stock, plaintiffs have presented a "better than negligible" likelihood of succeeding on the merits of their Section 13(d) claim. Under the law of the Seventh Circuit, further analysis is necessary before a decision to grant or deny preliminary injunctive relief can be rendered.

2. Violations of Section 14(d) of the Williams Act, 15 U.S.C. § 78n(d)

■ Plaintiffs claim that Desert Partners' combined filings under Section 13(d) amounted to a tender offer within the meaning of Section 14(d) of the Williams Act and thus triggered the requirements of that section and the rules and regulations that the Securities and Exchange Commission ("SEC") promulgated thereunder. Specifically, plaintiffs assert that defendants violated SEC Rule 14d–2, which requires a bidder who publicly announces its intention to commence a tender offer to either do so (and comply with all filing and disclosure requirements) or withdraw its offer within five days of that announcement. Under Rule 14d–2(b), a bidder is deemed to have commenced a tender offer if it makes a public announcement that includes: (1) the identity of the bidder; (2) the identity of the target company; (3) the amount and class of securities being sought; and (4) the price or range of prices being offered.

Defendants, in turn, argue that their Schedule 13D filings, even if considered together, fell within the "safe harbor" provision of Rule 14d–2(d). Rule 14d–2(d) pro-

vides that a public announcement which identifies the bidder and the target company but does not specify the amount of securities the target company seeks or the consideration it offers does not constitute the commencement of a tender offer.

This court cannot strain the scope of Rule 14d–2(b) to conclude that Desert Partners' combined Schedules 13D constituted a tender offer under the rule because of the "safe harbor" provision of Rule 14d–2(d). Desert Partners' Schedules 13D did, in fact, disclose the identity of the bidder and the target company. However, defendants' schedules disclosed neither the amount of securities it sought nor the price it offered. Although Desert Partners disclosed an intention to "acquire control" of the company in its second Schedule 13D, such a disclosure does not indicate the amount of securities the bidder seeks. Moreover, although Desert Partners mentioned that it could offer $50 a share, Desert Partners mentioned this number only in connection with a negotiated transaction with the management not a tender offer directly to the shareholders. Desert Partners' Schedule 13D disclosures fell within the "safe harbor" provisions of Rule 14d–2(d). Plaintiffs have not shown a "better than negligible" likelihood of success on their Section 14(d) claim.

3. Violations of the H–S–R Act, 15 U.S. C. § 18a

Plaintiffs next contend that Desert Partners violated Section 13(d) by failing to disclose that it had violated the H–S–R Act. According to plaintiffs, Desert Partners violated the H–S–R Act by (1) failing to comply with the notification and waiting period requirements of the Act, and (2) structuring their transactions to avoid these requirements. Plaintiffs claim that Section 13(d) required Desert Partners to disclose the nature of these violations in its Schedule 13D filings.

■ Section 13(d) may require a party to disclose the legal consequences resulting from the party's actions if such information is material to investors for reasons other than simply revealing their illegality.

*Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1502 (D.Del.1984). However, "if the party in good faith disputes the violations, the party need only disclose the possibility of the violations." *Warner,* 581 F.Supp. at 1502. *See also Kademian v. Ladish,* 792 F.2d 614, 622 (7th Cir.1986); *Gearhart Industries, Inc. v. Smith International, Inc.,* 592 F.Supp. 203, 221 (N.D.Tex.1984); *Revlon Inc. v. Pantry Pride, Inc.,* 621 F.Supp. 804, 812 (D.C.Del.1985); *Avnet, Inc. v. Scope Industries,* 499 F.Supp. 1121, 1125 (S.D.N.Y. 1980). The securities laws do not obligate defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction. *Kademian,* 792 F.2d at 622; *Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

■■ Desert Partners' fourth Schedule 13D disclosed the FTC's investigation into possible violations of the H–S–R Act. The fourth filing stated:

> The Federal Trade Commission's Bureau of Competition has notified the Partnership, the General Partners and Wagner & Brown that it has initiated an investigation to determine whether the requirements of [the H–S–R Act] have been fulfilled with respect to the Partnership's acquisition of Shares, and has requested that such parties provide voluntarily certain information and documents.

Moreover, the fourth Schedule 13D disclosed that plaintiffs' complaint alleging that Desert Partners violated Section 13(d) by failing to include their H–S–R violations in their 13D filings.

Section 13(d) does not require Desert Partners to make any additional disclosure concerning possible H–S–R Act violations. Desert Partners stated in their fourth Schedule 13D that they believed that their

acquisition of USG stock complied with the H–S–R Act.[12] Desert Partners maintains that it is an "ultimate party entity" with less than $10 million in sales or assets and thus is not subject to H–S–R's filing and waiting-period requirements. *See* 15 U.S. C. § 18a(a). Moreover, Mr. Reed testified that Mr. Wagner and Mr. Brown solicited other limited partnerships to participate in the venture for estate planning and tax reasons and also because neither of them were willing to contribute the total amount of necessary equity. (Reed Aff. ¶¶ 15–21). Defendants' evidence thus shows that Desert Partners had a good faith belief that they complied with H–S–R when they filed the fourth Schedule 13D.

Plaintiffs have not shown a "better than negligible" likelihood of success on their claim that Desert Partners' failure to disclose the extent of their alleged H–S–R violations violated Section 13(d).[13]

### 4. Violations of Rule 10b–5 of the 1934 Securities and Exchange Act

Finally, plaintiffs contend that defendants violated Section 10(b) of the 1934 Securities and Exchange Act. Section 10(b) makes it "unlawful for any person ... to use or employ ... any manipulative or deceptive device or contrivance in contravention of [SEC Rules]." To succeed on a Section 10(b) claim, plaintiffs must prove that (1) defendants' conduct occurred in connection with the purchase or sale of securities; (2) defendants misrepresented or omitted to state material facts; (3) plaintiff reasonably and justifiably relied upon the misrepresentations; and (4) defendants acted with *scienter. Beck v. Cantor, Fitzgerald & Co., Inc.,* 621 F.Supp. 1547, 1553 n. 5 (N.D.Ill.1985) and cases cited.

■■ Defendants contend, as a threshold matter, that plaintiffs cannot bring a claim under Section 10(b) because they are nei-

---

**12.** Desert Partners' fourth Schedule 13D stated that "[t]he Partnership, the General Partners, and Wagner & Brown believe that the Partnership's acquisition of Shares was in full compliance with the H–S–R Act and intend to cooperate with the Federal Trade Commission's investigation."

**13.** This court, of course, is not asserting any opinion as to the merits of a claim that Desert Partners violated or intentionally avoided the H–S–R reporting requirements. The court's holding suggests only that Desert Partners' disclosure concerning possible H–S–R claims against it satisfied Section 13(d).

ther purchasers nor sellers of USG securities. Some courts have held that a corporation which is the target of a tender offer does not have standing to maintain an action under Section 10(b) because it is not a purchaser or seller of securities. *See, e.g., Markel v. Scovill Mfg. Co.,* 657 F.Supp. 1102, 1107 n. 3 (W.D.N.Y.1987); *Camelot Industries Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174, 1182 (S.D.N.Y.1982). However, several courts have also held that a plaintiff seeking only injunctive relief, as are plaintiffs here, need not satisfy this strict standing requirement. *See, e.g., Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194 (3d Cir.1976); *Davis v. Davis,* 526 F.2d 1286, 1289–90 (5th Cir.1976); *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1495 (D.Del.1984); *Hanna Min. Co. v. Norcen Energy Resources Ltd.,* 574 F.Supp. 1172, 1198 (N.D. Ohio 1982); *Fuchs v. Swanton Corp.,* 482 F.Supp. 83, 89 (S.D.N.Y.1979); *Hundahl v. United Benefit Life Insurance Co.,* 465 F.Supp. 1349, 1359 (N.D.Tex.1979). Generally, "the exception applies to cases where a 10b–5 violation might occur in connection with a prospective purchase or sale of securities. It allows parties to obtain preventive injunctive relief enjoining the 10b–5 violation prior to the purchase or sale of the securities." *Warner,* 581 F.Supp. at 1495.

In this case, the plaintiffs have standing to assert a claim under Section 10(b) because they seek to enjoin Desert Partners from pursuing a tender offer of USG shares after allegedly committing a Section 10(b) violation. Plaintiffs seek to prevent further violations in connection with a prospective purchase and sale of securities. Thus, it falls within the "injunctive relief" exception to the Section 10(b) standing requirement.

Plaintiffs have shown a "better than negligible" likelihood of success on the merits of their Section 10(b) claim. As discussed in Part B.1 of this memorandum opinion, Desert Partners may possibly have constructed its Schedule 13D filings to manipulate the price of USG stock. Moreover, as evidenced by the reaction of the stock markets after Desert Partners made its second and third Schedule 13D filings,[14] the market may have relied on this misleading information in making investment decisions.

Finally, defendants may have acted with *scienter.* Evidence of parties' prior practices may be relevant in determining motive and intent on the part of a takeover bidder. *See Unocal Corporation v. Pickens, et al.,* 608 F.Supp. 1081 (C.D.Cal.1985), where the court examined the prior practices of T. Boone Pickens and another Wagner & Brown partnership in determining the parties' motives in announcing a tender offer for shares of Unocal stock. Plaintiffs note that Wagner & Brown and T. Boone Pickens have previously engaged in unsuccessful takeover activities which earned them substantial profits. (Zimmerman Aff. ¶¶ 3–4). Moreover, in 1986 and 1987 Wagner & Brown allegedly announced their intent to acquire control of three different companies, only to abandon their activites and sell their acquisitions at a substantial profit. (Zimmerman Aff. ¶¶ 5–6). Plaintiffs suggest that each of these takeover efforts involved the same pattern of conduct which plaintiffs allege is present in this case (Zimmerman Aff. ¶¶ 3, 5, and 9).

In light of this evidence, which Wagner & Brown has left substantially uncontradicted, the court concludes that plaintiffs have shown a "better than negligible" likelihood of succeeding on their Section 10(b) claim.

14. Shortly after Desert Partners filed the third Schedule 13D, three news organizations reported that defendants were prepared to make an offer for more than $50 per share:

The Dow Jones broad tape on October 29, 1987 reported that "Desert Partners had said in an SEC filing that it was willing to offer more than $50 a share in value to shareholders of USG Corp."

The Wall Street Journal reported on October 30, 1987 that "A Wagner & Brown partnership proposed buying USG Corp. for over $50 a share, or more than $2.5 billion."

The Chicago Tribune reported on October 30, 1987 that defendants were "willing to offer more than $50 a share" to buy USG.

## C. *Balance of Harms Element*

In *Curtis*, the Seventh Circuit reaffirmed that the district courts of this Circuit are to employ a "sliding scale" approach in deciding whether to grant or deny preliminary relief. *Curtis*, at 1296. Under this approach, the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor. *Brunswick*, 784 F.2d at 275. In this case, the plaintiffs have demonstrated a "better than negligible" but substantially less than fifty percent chance of prevailing on the merits. Nonetheless, plaintiffs may still be entitled to a preliminary injunction if they can "demonstrate that the balance of harms weighs *heavily* against [them] if the relief were not granted." *Curtis*, at 1296.

In an attempt to demonstrate how the balance of harms would weigh against them if the relief they seek is not granted, plaintiffs assert that Wagner & Brown's activities have significantly interfered with the management and operation of USG. (Complaint ¶ 68(c)). First, USG alleges that Desert Partners' allegedly misleading disclosures are affecting the investment decisions of both current and potential USG shareholders, and that therefore the company's ownership may be irreparably altered by Desert Partners' allegedly illegal activities. Second, USG alleges that Desert Partners' activities have adversely affected USG's ability to obtain financing for corporate transactions. USG presented the affidavit of W.R. Hogan, a USG Vice-President, which states that USG has been unable to acquire surety bonds without additional financing requirements since Desert Partners began its takeover activities. (Hogan Aff. ¶¶ 5–7). USG also has noted that Standard & Poor's ("S & P") has placed USG on a "credit watch" with "negative implications." (Hogan Aff. ¶ 3). Finally, USG has claimed that Desert Partners' activities are affecting USG's ability to recruit new employees, implement employee development programs, and has injured employee morale. (Snodgrass Aff. ¶¶ 5, 8; Stacy Aff. ¶ 4).

The evidence presented for the court's consideration, however, indicates that plaintiffs' alleged harms may not be due to Desert Partners' activities. USG's employee morale problems may be attributable to other factors, such as the downturn in the stock market, decreased demand due to a depressed construction industry, or to rumors that USG planned to dismiss several hundred of its salaried employees. (Appendix to Def. Mem. in Opp. Ex. 4, 5, and 7).

Moreover, USG's credit problems may be attributable to factors other than the Desert Partners' activity. The Reuter Financial Report discussing S & P's action indicates that "the action comes as a result of Desert Partners LP's intention to either gain control of USG or precipitate a restructure of the firm." (Hogan Aff. Ex. A). However, the same Reuter report noted that S & P placed the "credit watch" on USG because "any *defensive measures* such as share repurchases or major restructuring are likely to lead to higher debt levels than are consistent with current USG ratings." *Id.* (emphasis added). Consequently, at best the evidence indicates that S & P placed the "credit watch" because of *both* parties' activities.

In sum, according to the "sliding scale" analysis, plaintiffs have failed to demonstrate that the balance of harms weighs *heavily* against them if the injunctive relief they seek is not granted. In balancing the harms suffered by the granting or denying of the injunctive relief, it is clear that Desert Partners will experience significant harm were this court to grant plaintiffs' motion for preliminary injunction. A preliminary injunction against further purchases of USG stock may either prevent Desert Partners from ever making a tender offer, *see, e.g., Kennecott Corp. v. Smith*, 637 F.2d 181, 189 (3d Cir.1980); *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir.1974), or at the very least, cause any tender offer to be delayed. As the Supreme Court has noted, Congress "has recognized that delay can seriously impede a tender offer." *Edgar v. MITE*, 457 U.S. 624, 637–38, 102 S.Ct. 2629, 2638, 73 L.Ed.2d 269 (1982). Consequently, the harm to Desert Partners if the preliminary

injunction were to issue is substantial and not outweighed by the harms to the plaintiffs resulting from a denial of the injunctive relief plaintiffs seek.

Plaintiffs have not met their burden of proof on each of the five requisite elements which must be shown before a preliminary injunction can be issued under this Circuit's "sliding scale" analysis. Although the likelihood that plaintiffs will succeed on the merits of their claims is "better than negligible" and thus meets the "low" threshold test, *see Curtis*, at 1296–97; *Brunswick*, 784 F.2d at 275, the court finds that the evidence presented indicates that plaintiffs have just barely passed that threshold. Plaintiffs' tenuous position as to their likelihood of success requires them to demonstrate that the balance of harm weighs heavily against them if injunctive relief is not granted. Plaintiffs have failed to do so. Consequently, the court cannot issue the preliminary injunction.

## CONCLUSION

For the reasons stated in this memorandum opinion and order, plaintiffs' motion for preliminary injunction is DENIED. Case is set for status on Thursday, March 3, 1988 at 10:00 a.m.